IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTECH DIAGNOSTICS, INC., )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>DOWNERS GROVE ANIMAL HOSPITAL )<br>& BIRD CLINIC, P.C., *et al.*, )<br>    Defendants. ) | Civil Action No.: 12 C 2736<br><br>Suzanne B. Conlon, Judge |

## MEMORANDUM OPINION AND ORDER

Antech Diagnostics, Inc. ("Antech") seeks summary judgment on its claims that Downers Grove Animal Hospital & Bird Clinic, P.C. and its owners, Robert Merkin and Graham Merkin, breached a contract (Count I) and related loan agreement (Count II). Defendants filed a cross-motion for summary judgment as to Count I, contending Antech has no recoverable damages as it is not entitled to lost revenues or future profits. For the reasons set forth below, Antech's motion is granted in part and denied in part and defendants' cross-motion is denied.

## BACKGROUND

Defendants' response to Antech's facts contains multiple denials that are unsupported by citations to the record or fail to match Antech's facts. *See, e.g.*, Def. Resp. to Pl. Facts at ¶ 28 (stating Antech improperly raised prices for lab services in response to Antech's statement that defendants were satisfied with the quality of lab services). Antech similarly fails to provide citations consistently in support of its denials of defendants' facts. Failure to deny facts properly results in admission of the opposing side's facts to the extent they are supported by the record. L.R. 56.1 (a) & (b)(3)(A).

Antech asks the court to strike many of defendants' statements of additional fact, contending they are irrelevant or based on hearsay, and generally does not include a fall-back denial supported by record citations. Objections to statements of fact based on relevance are inappropriate. *See Keefe v. Mega Enters. Inc.*, No. 02 C 5156, 2005 WL 693795, at *1 (N.D. Ill. Mar. 23, 2005) (Manning, J.). The court will consider facts it deems relevant provided they are supported by the record. *Id.* Regarding hearsay objections, Antech primarily takes issue with statements made in Graham Merkin's affidavit. Antech may disagree with these statements, but they are admissible to the extent they are based on personal knowledge. *See Everett v. Cook County*, 704 F. Supp. 2d 794, 796 n.1 (N.D. Ill. 2010) (Kendall, J.). The court will not parse through the remainder of the hearsay objections, as they do not affect the merits of the cross-motions.

Next, the parties frequently disagree with each other's facts based on their conflicting interpretations of their contract. The court disregards these denials. Arguments regarding contract interpretation belong in memoranda, not Rule 56.1 responses. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement" or response).

Antech's responses to the defendants' facts and additional facts unnecessarily complicated the court's consideration of the parties' motions. Antech responded to the defendants' facts without repeating those facts, forcing the court to combine the two documents. Dkt. 67. In responding to defendants' additional facts, Antech repeated the additional facts but misleadingly omitted defendants' citations to the record. Dkt. 71-1. The court does not condone this gamesmanship. Finally, Antech added additional facts to its responses. This is improper.

The court disregards the additional facts to the extent they do not appear in a separate statement of additional facts. *See Prewitt v. United States*, Nos. 10 C 102 & 11 C 3136, 2012 WL 5381281, at *1 (N.D. Ill. Oct. 31, 2012) (Kocoras, J.). With this in mind, the following facts are taken from the parties' Rule 56.1 statements and exhibits.

As of December 2011, VCA Antech, Inc., through its subsidiaries, operated over 541 animal hospitals. Plaintiff Antech is one of those subsidiaries and provides laboratory services to veterinary hospitals. Antech entered into a Lab Services Agreement, beginning January 1, 2009, with the animal hospital owned by Robert and Graham Merkin. Pl. Facts at Ex. C. The agreement lists the parties as:

> Antech: Antech Diagnostics
> Animal Hospital(s): Downers Grove Animal Hospital
> Owner(s): Robert Merkin, D.V.M., Graham Merkin, D.V.M.

*Id.* at 1. Graham Merkin signed the agreement on behalf of "**ANIMAL HOSPITAL OWNER**" but Robert Merkin did not sign. *Id.* at 4 (emphasis in original); Def. Add'l Facts at ¶ 1.

The agreement defines laboratory services as "all veterinary diagnostic and clinical laboratory services," Pl. Facts, Ex. C at ¶ 1.2, and states Antech will be the animal hospital's exclusive provider of laboratory services for five years, subject to several exclusions not at issue. *Id.* at ¶ 1.1. Again subject to exclusions not at issue, the agreement provides that the animal hospital owner must spend at least $48,000 annually on Antech's laboratory services. *Id.* at 1. The agreement contains a confidentiality provision covering its terms, conditions, and pricing. The parties could terminate the agreement in writing if the animal hospital owner defaulted on a loan made pursuant to the agreement or if either party materially breached the agreement's terms.

*Id.* at ¶¶ 3.3, 4, 5. The agreement "constitute[d] the entire understanding and agreement of the parties hereto relating to the subject matter hereof." *Id.* at 4.

Under the agreement, Antech was obligated to loan $50,000 to the animal hospital owner, with repayment in annual installments of $10,000 plus interest, *id.* at 1, ¶ 3.1, unless the animal hospital owner complied with the minimum annual amount of services and exclusivity provisions and timely paid invoices, *id.* at ¶ 3.2. If the animal hospital owner defaulted on the loan, breached the agreement's exclusivity provision, or failed to pay invoices on time, the entire amount of the loan, minus any portion previously forgiven, would be accelerated. *Id.* at ¶ 3.3. Antech loaned $50,000 via a check naming the animal hospital as the payee. Def. Add'l Facts at ¶ 3. Antech asserts it made the check out to the animal hospital because Graham Merkin gave it a W-9 form with the animal hospital's tax identification number. Pl. Resp. to Def. Add'l Facts at ¶ 3.

If the animal hospital was dissatisfied with the quality of Antech's laboratory services, its owner was required to provide written notice to Antech and give Antech 30 days to respond. Pl. Facts, Ex. C at ¶ 1.2. If Antech's response was not "reasonably satisfactory," the animal hospital owner could terminate the agreement and repay the prorated portion of any unforgiven loan. *Id.* Graham Merkin testified the animal hospital was generally satisfied with Antech's laboratory services. *Id.* at Ex. E (Graham Merkin Dep. at 50- 51).

On February 1, 2010, however, Robert Merkin sent Antech a letter complaining about weekend sample pick-ups and invoking the 30-day provision. Def. Resp. to Pl. Facts, Ex. A at ¶ 19 (Graham Merkin Affidavit); Ex. I (February 1, 2010, letter). The parties' relationship nonetheless continued beyond the 30-day period. The animal hospital owners also were

dissatisfied with a price hike imposed by Antech, although there is no evidence they complained in writing. *Id.* at Ex. A, ¶ 18.

In 2011, the Merkins learned that a company associated with Antech had purchased Arboretum View Animal Hospital, a nearby competing animal hospital. Pl. Facts at ¶ 27; Ex. E (Graham Merkin Dep. at 47-48). Unhappy with Antech's connection to Arboretum View Animal Hospital, Graham Merkin terminated the agreement with Antech on February 28, 2012. *Id.* at ¶ 21; Ex. F (February 28, 2012, letter). He included a $28,333.34 check representing his calculation of the amount owed under the loan. *Id.* at ¶ 23.

Prior to February 28th, the Merkins never complained to Antech about the purchase of their competitor. *Id.* at ¶ 24; Ex. D (Robert Merkin Dep. at 44-45); Ex. E (Graham Merkin Dep. at 49, 81). At the time the agreement was negotiated, the Merkins knew Antech's parent company owned other animal hospitals in Illinois. *Id.* at ¶ 25. Graham Merkin asserts that Joe Eckert, Antech's Midwest regional sales manager, told him during negotiations that if Antech opened another hospital "right down the street," the animal hospital could terminate the agreement by repaying the unforgiven part of the loan. *Id.* at Ex. E (Graham Merkin Dep. at 67). Graham Merkin contends Eckert told him Antech could not seek lost profits if the agreement was terminated. Def. Add'l Facts at ¶ 18.

Upon receiving the February 28th letter, Eckert called Graham Merkin, who reiterated that defendants terminated the agreement due to the acquisition of Arboretum View Animal Hospital. Pl. Facts at Ex. E (Graham Merkin Dep. at 83); Exhibit I (Graham Merkin notes memorializing phone conversation). Graham Merkin did not express dissatisfaction with Antech's laboratory services. *Id.* at Ex. E (Graham Merkin Dep. at 83).

As of February 28, 2012, defendants had paid Antech $106,359.28 for laboratory services. *Id.* at ¶ 32. Antech asserts it would have received $240,000 if the agreement had lasted the full 60-month term, leaving a balance of $133,640.72. *Id.* at ¶ 34. Brian Brown, Antech's Assistant Comptroller, believes Antech saved 31.7% of the $133,640.72 by not having to perform, making Antech's damages under the agreement $91,276.61. *Id.* at ¶ 35. The defendants contend Brown is not qualified to testify about damages and his calculations are incorrect. Def. Add'l Facts at ¶¶ 32-48.

Brown also calculated that Antech was owed $28,000.84 under the loan. Pl. Facts at ¶ 36. Defendants admit Brown "performed [a] calculation" but contend Antech's damages are limited to repayment of non-forgiven portions of the loan. *Id.* at ¶ 33. Defendants claim that, due to forgiveness, they owed Antech $28,333.34, which they paid when they terminated the agreement. *Id.* at ¶ 33. Defendants stress Eckert believed the agreement did not allow Antech to recover lost profits. Def. Add'l Facts at ¶ 22; Eckert Dep. at 180:17-21.

## DISCUSSION

### I. Summary Judgment Standard

At summary judgment, the court views the evidence in a light most favorable to the nonmoving party. *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012). Summary judgment is appropriate if the record evidence reveals no genuinely disputed material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Rosario*, 670 F.3d at 820. Because the parties filed cross motions for summary judgment, the court must evaluate each motion by construing the facts against the non-moving party. *FTC v. Cleverlink Trading Ltd.*, 519 F. Supp.2d 784, 792 (N.D. Ill. 2007) (Kendall, J.) (describing a "Janus-like"

perspective on cross motions for summary judgment). Many of the facts here are undisputed, but for disputed facts, the court draws reasonable inferences in favor of the non-movant.

## II. The Cross-Motions for Summary Judgment

Antech claims defendants breached the agreement (Count I) and related loan agreement (Count II). It seeks summary judgment on both counts. Defendants filed a cross-motion for summary judgment only as to Count I, arguing the agreement limits damages to repayment of the loan. The parties agree California law governs.

### A. Count I – Breach of the Lab Services Agreement

The Merkins first contend they cannot be liable for breach of contract because Graham Merkin signed the agreement on behalf of "Animal Hospital Owner," not individually, and Robert Merkin did not sign at all. The court addressed this argument when it denied defendants' motion to dismiss. Dkt. 21 at 5-8.

The court noted the agreement: (1) lists the parties as Antech Diagnostics, Downers Grove Animal Hospital, and animal hospital owner Robert and Graham Merkin; (2) contains numerous references to the animal hospital owner's duties; (3) provides benefits and obligations for the owner, who receives a $50,000 loan, must make payments on the loan, and may receive loan forgiveness; and (4) does not identify the animal hospital as a professional corporation or indicate that Graham Merkin, who signed above the line "**ANIMAL HOSPITAL OWNER**" signed on behalf of the animal hospital and not individually. *Id.* (emphasis in original). The court held under California law that a nonsignatory such as Robert Merkin who voluntarily accepts a contract's benefits may be deemed to have consented to that contract. *Id.* The court

declines to revisit these conclusions given that defendants simply repeat their previously rejected arguments.

The only additional fact at the summary judgment stage is that Antech made the $50,000 check for the loan payable to the animal hospital, not the Merkins. However, the record shows Antech did so because Graham Merkin provided a W-9 form with the animal hospital's tax identification number. The naming of the animal hospital as the check's payee, even when construed in favor of the defendants, merely shows Antech agreed to honor Graham Merkin's wishes regarding the check. It neither deletes the agreement's definition of "animal hospital owner" as Graham and Robert Merkin nor negates the agreement's language about the animal hospital owner's obligations and responsibilities. *See Hill v. Opus Corp.*, 464 B.R. 361, 396-97 (C.D. Cal. 2011) (Morrow, J.) (under California law, "[a] court may not create ambiguity through the use of extrinsic evidence"). Thus, the court declines to revisit its conclusion that the animal hospital and its owners are potentially liable for breach of the agreement.

Antech argues the defendants breached the agreement by terminating after 26 months despite their promise to use Antech's laboratory services exclusively for 60 months. To prove breach of contract, Antech must establish: (1) the contract's existence, (2) its performance under the contract, (3) defendants' breach, and (4) that it suffered damages as a result. *Mintz v. Mark Bartelstein & Assocs., Inc.,* — F.Supp. 2d —, 2012 WL 5391779, at *13 (C.D. Cal. 2012) (Wilson, J.) (citing *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011)).

Paragraph 1.2 of the agreement allows the animal hospital owners to terminate if they tell Antech, in writing, that its laboratory services are unsatisfactory and Antech fails to make "reasonably satisfactory" changes to those services within 30 days. Pl. Facts at Ex. C, ¶ 1.2. It is

undisputed the owners terminated based not on unsatisfactory laboratory services but due to the purchase of their competitor by Antech's affiliate. The owners were not entitled to terminate under ¶ 1.2.

Defendants argue they were entitled to terminate under ¶ 5, which provides that " [i]f (i) a default with respect to the loan occurs . . . or (ii) either party is otherwise in material breach of the terms and provisions hereof, then the other party may terminate this Agreement upon written notice to party in the breach." *Id.* at ¶ 5. They contend the purchase of Arboretum View Animal Hospital by Antech's affiliate materially breached the agreement because Antech knew Arboretum View Animal Hospital was a direct competitor. However, the plain language of the agreement allows termination based on a material breach of its "terms and provisions." *Id.* The agreement is silent about the purchase of other animal hospitals. Paragraph 5 does not allow defendants to terminate based on a reason outside the agreement's four corners. *See Custom LED, LLC v. eBay, Inc.*, No. C 12-00350 SI, 2012 WL 1909333, at *3 (N.D. Cal. May 24, 2012) (Illston, J.) ("[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.") (quoting Cal. Civ.Code § 1636). Antech has established the animal hospital and owners improperly terminated the agreement.

Because there is no dispute that the agreement existed and the court determined Antech performed under the agreement while defendants did not, the final issue is whether Antech has established damages. As a threshold matter, Antech contends defendants' failure to file an affirmative defense challenging damages means they waived their ability to contest damages. Antech has waived its waiver argument by raising it in its reply. *See Vasarhelyi v. Rojas*, No. 09

C 6256, 2010 WL 737589, at *1 n.1 (N.D. Ill. Feb. 26, 2010) (Conlon, J.) (citing *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)). In any event, a challenge to damages "is not really an affirmative defense, because it does not raise any new matter that would defeat recovery." *Senne v. Village of Palatine*, No. 10 C 5434, 2013 WL 68703, *4 (N.D. Ill. Jan. 4, 2013) (Kennelly, J.). The court may consider defendants' arguments about Antech's damages. *See Hinkle Eng'g, Inc. v. 175 Jackson L.L.C.*, No. 01 C 5078, 2002 WL 31248492, at *3 (N.D. Ill. Oct. 3, 2002) (Kocoras, J.) (striking affirmative defense challenging damages).

Turning to Antech's claimed damages, defendants first contend the agreement limits damages to repayment of the loan and does not allow recovery of lost profits. The court previously held Antech could recover general damages under the agreement and was not limited to recovering money due under the loan. Dkt. 21 at 3-4.

Second, defendants assert extrinsic evidence shows the parties agreed Antech would not be entitled to lost profits if the animal hospital or its owners breached the agreement. Subject to several exclusions not at issue, the agreement states Antech will be the animal hospital's exclusive provider of laboratory services for five years, requires the animal hospital owner to spend at least $48,000 annually on Antech's laboratory services, and allows the parties to terminate based on a material breach of the agreement's terms. The agreement "constitutes the entire understanding and agreement of the parties hereto relating to the subject matter hereof." Pl. Facts, Ex. C at 1 and ¶¶ 1.1, 5 & 6. As previously held, no language in the agreement purports to limit remedies in the event of a breach. Dkt. 21 at 3.

Under California law, parties may not introduce extrinsic evidence that varies, alters, or supplements their written agreement. *See* Cal. Civ.Code § 1856(a); *see also MK Ballistic Sys. v. Simpson*, No. 07-C-00688 RMW, 2009 WL 86699, at *3 (N.D. Cal. Jan 9, 2009) (Whyte, J.). Extrinsic evidence is admissible if it "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Travelers Cas. & Sur. Co. of Am. v. Highland P'ship, Inc.*, No. 10 C 2503 AJB DHB, 2012 WL 5928139, at *17 (S.D. Cal. Nov. 26, 2012) (Battaglia, J.) (internal quotations omitted). Here, defendants are attempting to use extrinsic evidence to add a limitation of remedies provision. This is improper. Moreover, the agreement contains an unequivocal integration clause stating the agreement reflects the parties' "entire understanding." This language is not "reasonably susceptible" to an interpretation that allows defendants to introduce evidence of alleged agreements outside the contract's four corners. Thus, defendants may not use extrinsic evidence to defeat Antech's requested damages.

Third, defendants claim Antech may only recover damages that are "clearly ascertainable in both their nature and origin." Cal. Civ.Code § 3301. They assert Antech's evidence supporting its claimed damages – the testimony of its Assistant Comptroller, Brian Brown – is improper lay witness testimony that should be excluded. Under Fed. R. Evid. 701, a lay witness may testify about matters rationally based on his perception if "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701. Lay witnesses may not opine about scientific, technical or other specialized knowledge within the scope of Fed. R. Evid. 702. *Id.*; *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

Defendants concede Brown has personal knowledge about Antech and its business practices. However, they contend that because he did not negotiate the agreement, he lacks

personal knowledge about "the unique incentives and price discounts" behind the agreement that the animal hospital would spend at least $48,000 annually on Antech's laboratory services for five years. Defendants thus conclude Brown cannot opine about lost profits resulting from a breach.

Defendants' position is unavailing. Officers of a business are generally permitted "to testify to the value or projected profits of the business" based on particularized knowledge resulting from their position in the business. Rule 701, Advisory Committee Notes to the 2000 Amendments. Brown has been Antech's assistant comptroller for five years, supervises more than 20 people in the accounting department, and previously worked for Antech's parent company as a senior financial analyst, a financial reporting manager, and the director of finance and financial reporting. He calculated damages by subtracting the amount defendants paid for laboratory services ($106,359.28) from the minimum amount Antech would have received if the agreement had lasted the full 60-month term ($240,000). Multiplying the balance ($133,640.72) by 68.3% (a percentage reflecting his belief, based on his knowledge of the costs of Antech's laboratory services, that Antech saved 31.7% by not having to perform), Antech's damages are $91,276.61.

Defendants simultaneously characterize these calculations as "overly simplistic" and too complex to be made by a layperson. Def. Reply at 5, 7. They note Brown has never testified in court or been qualified as an expert. The complexity of the calculations is not germane for purposes of Rule 701. See Fed. R. Evid. 701. Moreover, Rule 701 neither conditions the ability to testify on a witness's prior experience on the stand nor requires a lay witness to be qualified as an expert under Rule 702. In essence, defendants attempt to conflate the admissibility of

Brown's testimony with its weight. This is incorrect, so the court declines to reject Brown's testimony outright.

This brings the court to the defendants' fourth argument: Brown's calculations are flawed and cannot support Antech's claimed damages. While defendants criticize the calculations, they do not present evidence supporting their position. For example, they take issue with Brown's failure to break out discounts from revenue, asserting numerous variables, besides price discounts, affect revenue but are not included in Brown's calculations. Def. Reply at 8.

Defendants' criticisms are plausible but unsupported, so they do not counter Antech's damage calculation. *See Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998) ("A plausible scenario cannot counter direct evidence offered in support of a motion for summary judgment"); *see also DJ Mfg. Corp. v. United States*, 33 Fed.Cl. 357, 361 (Fed. Cl. 1995) (Smith, J.) ("plaintiff's protestations regarding the procedures used by the contracting officer to arrive at the damages rate have no bearing on the issue of whether the rate itself was a reasonable forecast of damages."), *aff'd by* 86 F.3d 1130 (Fed. Cir. 1986); *Ross University School of Medicine, Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 KAM, 2012 WL 6091570, at *20 (E.D.N.Y. Dec. 7, 2012) (Mann, J.) (district court may accept the analysis of the plaintiff's expert about damages when the defendant's summary judgment filings do not rebut it with admissible evidence). Antech's admissible lay opinion testimony supports its damages calculation, while defendants' conjecture neither creates a material issue of disputed fact nor entitles them to prevail on their cross-motion for summary judgment. The court accepts Brown's damages calculation of $91,276.61.

Finally, defendants contend Antech cannot receive all profits from the agreement's five-year lifespan *and* retain their check for $28,333.34 in outstanding loan payments as of the time the agreement was terminated. They argue 100% of the $50,000 loan would have been forgiven if the agreement had lasted the full five years.

Under California law, the prevailing party in a breach of contract action is entitled to "the benefit of the bargain that full performance would have brought." *VCA Cenvet, Inc. v. Chadwell Animal Hosp., LLC*, No. JKB–11–1763, 2012 WL 4005542, at *6 (D.Md. Sept, 10, 2012) (Bredar, J.) (quoting *New W. Charter Middle Sch. v. Los Angeles Unified Sch. Dist.*, 114 Cal. Rptr. 3d 504, 515 (Cal. App. 2 Dist. 2010)). Because Antech would have forgiven 100% of the $50,000 loan if defendants had fully performed, a double recovery would result if Antech was allowed to retain the $28,333.34 owed on the loan at the time of termination plus profits for the full lifespan of the agreement. *See id.* Accordingly, Antech's motion for summary judgment as to Count I is granted, the defendants' cross-motion for summary judgment is denied, and Antech is awarded $62,943.27 in damages ($91,276.61 – $28,333.34).

### B. Count II – Breach of Loan Agreement

In Count II, Antech alleges defendants breached the terms of the loan made pursuant to the agreement by failing to use Antech's laboratory services exclusively for 60 months. Antech requests $28,000.84 in damages (the $50,000 loan – $21,999.16 in forgiven payments). Defendants paid Antech $28,333.34 when they terminated the agreement. This amount was credited against the damages awarded to Antech for lost profits to avoid a double recovery. Antech has received all the relief sought in Count II so its motion for summary judgment as to

this count is denied as moot. Dkt. 21 at 5 ("If Antech has received its requested relief, no case or controversy remains for the court to decide, depriving it of subject matter jurisdiction.").

## III. Conclusion

Antech's motion for summary judgment is granted in part and denied in part. Antech is entitled to summary judgment on Count I and is awarded $62,943.27 in damages. Antech's motion for summary judgment on Count II is denied as moot. Defendants' cross-motion for summary judgment on Count I is denied.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

February 28, 2013